UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
DARREL A. OLIPHANT,

                    Plaintiff,          **MEMORANDUM AND ORDER**

          -against-                     11-CV-2431


MICHAEL J. ASTRUE, COMMISSIONER
of SOCIAL SECURITY,

                    Defendant.
-------------------------------X

**MATSUMOTO, United States District Judge:**

          Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Darrel

A. Oliphant ("plaintiff") appeals the final decision of

defendant Michael Astrue, Commissioner of Social Security

("defendant" or the "Commissioner"), who denied plaintiff's

application for Social Security Disability ("SSD") and

Supplemental Security Income ("SSI") benefits under Title II and

Title XVI, respectively, of the Social Security Act (the "Act").

Plaintiff contends that because he is disabled within the

meaning of the Act, he is entitled to receive the aforementioned

benefits.

          Presently before the court are (1) defendant's motion

and (2) plaintiff's cross-motion for judgment on the pleadings.

For the reasons set forth below, the court denies plaintiff's

cross-motion for judgment on the pleadings, grants defendant's

cross-motion for judgment on the pleadings, and affirms the
Commissioner's decision.

**BACKGROUND**

## I. Procedural History

Plaintiff protectively filed an application for SSD on
May 17, 2007, and an application for SSI on May 25, 2007. (ECF
No. 21, Administrative Record ("Tr.") at 12, 119.) In both
applications, plaintiff alleged that he was unable to work
beginning October 20, 2006, due to "medical, orthopedic, and
psychiatric impairments." (ECF No. 1, Complaint ("Compl.")
¶ 4). Specifically, plaintiff cited "[h]igh blood pressure,
heart failure, high cholesterol, [and] pain all over body" as
disabling conditions on a Disability Report.[1] (Tr. 143.) On
September 17, 2007, both of plaintiff's applications for
benefits were denied. (*Id.* at 12, 68.) Plaintiff requested and
was granted a hearing before an administrative law judge
("ALJ"). (*Id.* at 12, 76-77.)

On June 24, 2009, plaintiff appeared with his
attorney, Marc Strauss, Esq., before ALJ Gal Lahat. (*Id.* at 12,
28.) Plaintiff testified at the hearing, and medical expert Dr.

---

[1] The "pain" mentioned here likely refers to plaintiff's alleged back and
chest pain and corroborates his claim of orthopedic and medical
impairments. At his hearing before ALJ Lahat, plaintiff also indicated
that he sometimes experiences depressive symptoms (Tr. at 50), but
plaintiff often focuses on other impairments and omits mention of any
disabling psychiatric condition.

Louis Lombardi and vocational expert Andrew Pasternak, testified via post-hearing interrogatory. (*Id.* at 12, 194-98, 933-37.)

On February 16, 2010, ALJ Lahat found that plaintiff was not disabled pursuant to the five-step sequential evaluation for determining whether an individual is disabled.[2] (*Id.* at 14-17.) Specifically, the ALJ found that plaintiff had the residual functional capacity ("RFC")[3] to perform a broad range of sedentary work.[4] (*Id.* at 17.) Consequently, although the ALJ concluded that plaintiff was not able to perform his past relevant work, the ALJ determined that plaintiff could perform jobs that exist in significant numbers in the national economy, considering plaintiff's age, education, employment experience, and RFC. (*Id.* at 26-27.)

---

[2] "[I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the SSA Regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find [the claimant] disabled if (5) there is not another type of work that claimant can do." *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (citation omitted); *see* 20 C.F.R. § 404.1520(a)(4).

[3] "Residual functional capacity" is a measure of the work that a person is still capable of doing despite limitations resulting from physical and mental impairments. 20 C.F.R. § 416.945(a).

[4] "Sedentary work is the least rigorous of the five categories of work recognized by the SSA Regulations." *Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998). It "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Rosa v. Callahan*, 168 F.3d 72, 78 n.3 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

The ALJ's decision became the final decision of the Commissioner on April 25, 2011, when the Appeals Council denied plaintiff's request for review. (*Id*. at 1-6; Compl. ¶ 8.) Plaintiff filed the instant action on May 17, 2011, challenging the ALJ's decision to deny disability benefits. (*See generally* Compl.)

## II. Non-Medical Facts

Plaintiff was born on March 16, 1966. (Tr. 38, 41.) He was forty years old at the alleged onset of disability (October 20, 2006). (*See* Compl. ¶ 5.)

Plaintiff completed no schooling beyond eleventh or twelfth grade. (Tr. 41, 148.) From 1991 to 2004, plaintiff worked for a gunsmith, buffing and polishing guns. (*Id*. at 42, 144.) He also worked as a cashier and a forklift operator during an unknown time period. (*Id*. at 42.)

Plaintiff last worked as a delivery truck driver for twelve to eighteen months, ending in October 2006, the alleged onset of his disability. (*Id*. at 41-42, 144.) The reason for plaintiff's departure from his employment is unclear, as his testimony on this subject has been inconsistent. Plaintiff alternately testified that he: (1) "originally left [his] job because [he] had an [automobile] accident" (*id*. at 55); (2) "was fired due to [his] disability" and calling in sick "to[o] many times" (*id*. at 143); and (3) stopped working in October 2006 due

to a "sharp pain . . . under [his] heart, . . . [that] took [him] off of work for a couple of days" before he had surgery[5] (*id.* at 43).  It appears that plaintiff stopped working after he suffered acute injuries, including back pain, from a work-related automobile accident.[6]  (*Id.* at 231-32, 881, 887.)

In October 2007, and from October 8, 2008, to June 2009, plaintiff was incarcerated at Rikers Island Prison ("Rikers") for heroin possession with intent to sell.  (*Id.* at 47, 51-52, 131, 436.)  Plaintiff testified that he used heroin "three times a day" for "about two years" until his incarceration on October 8, 2008.  (*Id.* at 52, 131.)  He entered a drug rehabilitation program while incarcerated and has continued to struggle with drug addiction.  (*Id.* at 53, 364 (noting that plaintiff was abusing "cocaine, heroin, [and] alcohol").)

Plaintiff currently resides in his mother's basement. (*Id.* at 50.)  When he leaves home, plaintiff reports that he walks, uses public transportation, or rides in a car, but he does not drive.  (*Id.* at 157.)  Although plaintiff shops for groceries with his mother, he does not perform household chores.  (*Id.* at 50.) Plaintiff testified that he cannot do household chores because if

---

[5] Plaintiff's heart surgery occurred in May 2007, but he left work in October 2006; thus, this third account of his work history cannot be accurate.  (*Id.* at 254-55, 976.)

[6] Plaintiff received Worker's Compensation benefits for these injuries.  (*See id.* at 17.)

he did, "[he]'d be going up and down steps a lot" and would experience "shortness of breath and probably get dizzy." (*Id.*) Conversely, examining consultant Dr. Wahl reported that "[w]ith the cooking, cleaning, and laundry, when there is heavy lifting, [plaintiff] needs help; otherwise he can do it by himself." (*Id.* at 282.)

With regard to his daily activities, plaintiff sits, watches television, listens to the radio, reads, eats, and socializes. (*Id.* at 46, 282.) He also reports that he lies down for about three or four hours each day to relieve dizziness, lightheadedness, and chest pain. (*Id.* at 47.) Plaintiff is able to shower, bathe, and dress by himself. (*Id.* at 156, 282.)

## III. Medical Facts

### A. Plaintiff's Medical History Prior to Alleged Onset Date of October 20, 2006

Plaintiff's medical history prior to the alleged onset date, October 20, 2006, reflects only pre-existing hypertension. (Tr. 887.) Prior to October 20, 2006, however, plaintiff did not take medication for this or any other condition. (*Id.* at 888.)

### B. Plaintiff's Testimony Regarding Symptomatic Limitations

At plaintiff's June 24, 2009 hearing before ALJ Lahat, plaintiff testified that he suffers from shortness of breath,

back pain, chest pain, and tingling or numbness in his
extremities. (Tr. 43-45, 54.) Plaintiff also reported that he
can sit for approximately two hours, but "sometimes [his] legs
will get numb," requiring him to stretch or walk around. (*Id*.
at 46.) Plaintiff further stated that he is able to walk for
thirty minutes before stopping to catch his breath. (*Id*.) In
addition, plaintiff testified that he can stand for
approximately one hour, although he sometimes experiences
lightheadedness or dizziness thereafter. (*Id*.) Plaintiff
expressed his belief that he can lift and carry about ten or
twenty pounds, but back pain limits his ability to bend. (*Id*.
at 50, 57.) Plaintiff also testified that his medications
occasionally make him feel "jittery," and on occasion, he
continues to experience symptoms of depression. (*Id*. at 50,
54.)

   **C.   Treating Sources for Plaintiff's Physical Impairment**

        On October 27, 2006, plaintiff was involved in a work-
related automobile accident. (*See* Tr. 887.) The next day,
plaintiff went to Jamaica Hospital Medical Center (JHMC)
complaining of back pain arising from the car accident. (*See
id*. at 231-32, 887.) Cervical spine x-rays at JHMC revealed
that plaintiff suffered mild degenerative disc disease limited
to C5 and C6. (*Id*. at 231.) The x-rays also showed a normal

chest with a heart "normal in size and configuration." (*Id.* at 232.)

### 1. Arkadiy Shusterman, D.O., Internist (October 2006 – September 2008)

Four days after the car accident, Dr. Arkadiy Shusterman, an internist, examined plaintiff, who complained of dizziness, neck pain and stiffness, mid/lower back pain, lower back stiffness, and anterior chest wall pain/soreness. (*See* Tr. 887-90.) Dr. Shusterman recorded clinical findings typical of someone recently injured in a car accident. (*Id.*)

Specifically, Dr. Shusterman observed that plaintiff exhibited a limping gait and a tender anterior chest wall. (*Id.* at 888.) The cervical and lumbosacral spine had muscle spasms, trigger points, decreased range of motion, and tenderness; and the thoracic spine had muscle spasms with trigger points. (*Id.* at 889.) In plaintiff's upper and lower extremities, range of motion was normal, motor strength was somewhat limited (4/5), and deep tendon reflexes were normal, except for deficits in the brachialis and right patellar reflexes.[7] (*Id.* at 888-89.) Sensation was diminished bilaterally along the skin supplied by spinal nerves from C5 and L5. (*Id.* at 888.)

_____

[7] Deep tendon reflexes measure the integrity of the nervous system; the deficit in plaintiff's brachioradialis (wrist) reflex indicated a possible injury to the cervical spine (C5 to C7) and the deficit in the patellar (knee) indicated a possible injury to the lumbar spine (L2 to L4).

As a result of his findings, Dr. Shusterman diagnosed: blunt trauma to head, anterior chest wall contusion, acute strain/sprain of the cervical and lumbosacral spine, and muscle spasm along the thoracic (T1-T7) spinal column. (*Id.* at 889.) Dr. Shusterman also ruled out intervertebral disc displacement and cervical and lumbosacral radiculopathy.[8] (*Id.*) In concluding his report, Dr. Shusterman described plaintiff as "totally disabled" and recommended physical therapy ("PT"). (*Id.* at 889-90.)

Dr. Shusterman continued to see plaintiff every four to six weeks from October 2006 until September 2008. (*See id.* at 887-926.) During each visit, Dr. Shusterman reported very similar findings and made seemingly routine recommendations. (*See id.*) Specifically, Dr. Shusterman often noted that plaintiff reported mild improvement and compliance with PT, but still complained of neck and back pain. (*See id.*) Dr. Shusterman also recorded spasms or tenderness along plaintiff's spine and decreased range of motion in the cervical and lumbosacral spines, sometimes quantifying the degree. (*See id.*; *see also, e.g.*, *id.* at 872.) Plaintiff's motor strength was often full (5/5) throughout plaintiff's body, but sometimes limited (4/5) in one or more extremity. (*See id.* at 887-926.)

---

[8] Radiculopathy is a broad term for nerve impairments, such as a pinched nerve, that can cause pain, numbness, weakness, and reduced function in the body parts controlled by the damaged spinal nerve.

In addition, Dr. Shusterman sometimes noted that plaintiff's straight leg raising was limited, usually at a 50-degree angle. (*See id.*)

Dr. Shusterman concluded each treatment report with the following recommendations: "[c]ontinue PT 3 times per week and upgrade appropriately" and "[f]ollow-up appointment in 4 weeks." (*Id.*) In many of the reports, he described plaintiff as "[t]otally disabled." (*See, e.g.*, *id.* at 916.) At Dr. Shusterman's direction, plaintiff attended PT intermittently until September 2008. (*See id.* at 928-32.) Plaintiff's physical therapist reported that plaintiff typically had a "good" response to PT. (*Id.*)

## 2. Marc Rosenblatt, D.O., Rehabilitation (November 2006)

On November 15, 2006, Dr. Marc Rosenblatt, a specialist in rehabilitation medicine, examined plaintiff regarding plaintiff's complaints of neck and back pain. (Tr. 871-73.) At the time, plaintiff was taking ibuprofen, muscle relaxants, and anti-hypertensives. (*Id.* at 872.)

Dr. Rosenblatt observed that sensation was generally intact and motor strength was full (5/5) throughout plaintiff's body. (*Id.* at 872.) Deep tendon reflexes were normal and symmetric. (*Id.*) Limitations in straight leg raising and in the cervical and lumbosacral spine range of motion were noted.

(*Id.*)  Like Dr. Shusterman, Dr. Rosenblatt ruled out cervical and lumbar radiculopathy.  (*Id.* at 872-73; *see id.* at 889.)  Dr. Rosenblatt recommended rehabilitation, MRI, and electrodiagnostic studies.  (*Id.* at 872-73.)

### 3.  Mark Shapiro, M.D., Radiologist (January 2007)

Dr. Mark Shapiro, a radiologist, examined plaintiff on January 8, 2007, and performed MRIs.  (Tr. 875-76.)  A cervical spine MRI revealed focal central herniations at C5-C6 and C6-C7 with no bulge, spinal stenosis, or foraminal encroachment.  (*Id.* at 876.)  Likewise, a lumbar spine MRI revealed a central disc herniation at L5-S1 with no bulge, spinal stenosis, or foraminal impingement.[9]  (*Id.* at 875.)

### 4.  Marc Rosenblatt, D.O., Rehabilitation (January 2007)

On January 31, 2007, Dr. Rosenblatt's comprehensive electrodiagnostic studies (to test nerve conduction and electromyography) of plaintiff's major nerves, extremities, and cervical and lumbosacral paraspinal (adjacent to the spine) musculature were all within normal limits.  (Tr. 878-79.)  The studies did not reveal evidence of nerve damage.  (*Id.* at 879.)

### 5.  Jonathan Wahl, M.D., Internist (August 2007)

In August 2007, internist Dr. Wahl's consultative examination of plaintiff revealed normal clinical findings

---

[9] These findings reflect absence of nerve involvement or damage in the cervical and lumbar spine.

without physical limitations in movement, spinal range of motion, or straight leg raising. (Tr. 283; *see infra* Part III.F.2.) Plaintiff's motor strength was full (5/5), deep tendon reflexes were equal, and there were no sensory deficits. (*Id.*)

### 6. Elmhurst Hospital: Hospitalization for Pneumonia (October 2007)

On October 2, 2007, while hospitalized for pneumonia, plaintiff exhibited full range of motion, normal neurological function, and no back, neck, or limb pain. (Tr. 426-44.)

### 7. Grace Chow, M.D., Internist (May and July 2008)

On May 29, 2008, internist Dr. Grace Chow conducted a neurological examination of plaintiff that revealed normal sensation, normal motor function, and equal deep tendon reflexes. (Tr. 1257-58.) Dr. Chow prescribed a Lidocaine patch for plaintiff's shoulder pain. (*Id.* at 1258.) During plaintiff's follow-up visit on July 10, 2008, plaintiff indicated to Dr. Chow that the Lidocaine patch resolved his shoulder pain. (*Id.* at 1251.)

### 8. Medical Examinations Conducted During Plaintiff's Incarceration at Rikers (October 8, 2008 – June 8, 2009)

Medical examinations conducted during plaintiff's incarceration at Rikers generally revealed no clinical findings or medical imaging results to support plaintiff's occasional

complaint of back pain, and following each medical examination, plaintiff received conservative treatment. (*See Tr*. 303, 309, 321, 381-84.) Specifically, plaintiff's medical examinations revealed the following:

- On October 10, 2008, plaintiff's intake physical revealed normal motor strength, sensation, reflexes, and gait, and no neurological deficits. (*Id*. at 381-84.)

- Similarly, on October 21, 2008, plaintiff had full range of motion in his neck and extremities, and a neurological exam revealed no deficits. (*Id*. at 303.)

- On October 24, 2008, a lumbosacral x-ray was negative, revealing no notable abnormality. (*Id*. at 309.)

- On November 18, 2008, P.A. Nance and Dr. Desroches diagnosed stable chronic low back pain and prescribed Naprosyn (anti-inflammatory) and Robaxin (muscle relaxant). (*Id*. at 322.) During a separate follow-up exam conducted the same day, plaintiff had full range of motion, non-tender extremities, and some tenderness in the lumbosacral region. (*Id*. at 321.)

- On January 2, 2009, plaintiff complained of chest and lower back pain and shortness of breath after excessive exercise. (*See id*. at 340, 343.) He was transported from Rikers to Elmhurst Hospital, and then to Bellevue Hospital for

treatment.  (*Id*. at 452, 463.)  Clinical testing revealed that plaintiff had acute rhabdomyolysis, the breakdown and release of muscle fibers into the bloodstream.  (*See id*. at 329, 332.)  Drs. Stephanie Wang and Edra Stern determined that rigorous exercise, heavy weightlifting, and overexertion prior to onset of chest or back pain caused plaintiff's episode of rhabdomyolysis.  (*See id*. at 330, 520, 561, 564, 565-67, 572.)  Aggressive fluid hydration stabilized plaintiff (*id*. at 520), and he returned to Rikers on January 8, 2009.  (*Id*. at 329.)

- On March 5, 2009, plaintiff's last medical visit for back pain during incarceration, plaintiff experienced tightness in the muscle surrounding the thoracolumbar spine.  (*Id*. at 368.)  Plaintiff's straight leg raising was not limited. (*Id*.)  The orthopedist noted a history of lower back pain and sciatica (pain or numbness in the leg due to injury or compromise of the sciatic nerve) and recommended that plaintiff begin PT, which plaintiff attended only once on March 11, 2009.  (*Id.; see id*. at 423.)

### 9. Medical Examinations Conducted After Plaintiff's Incarceration (June 2009 – October 2009)

At the hearing before ALJ Lahat on June 24, 2009, plaintiff reported that he was seeing a chiropractor and taking ibuprofen twice a week for back pain.  (Tr. 56-57.)

On July 30 and September 22, 2009, Dr. Chow examined plaintiff regarding his complaints of neck and back pain. (*Id.* at 1240-44.)  Dr. Chow did not record any positive clinical findings (*id.* at 1240-44), but prescribed Flexeril and Roaxin in accordance with plaintiff's request for muscle relaxants. (*Id.* at 1240, 1244.)  Dr. Chow scheduled pain management, which she cancelled when plaintiff reported that the pain resolved with medication. (*Id.* at 1238, 1240.)

On October 12, 2009, an x-ray revealed normal radiographs of the chest with only "mild degenerative changes of the spine."[10]  (*Id.* at 1226.)

### D.   Treating Sources for Plaintiff's Cardiac Impairment

#### 1.   JHMC: Hospitalization and Heart Surgery (May 2007)

On May 9, 2007, plaintiff went to the JHMC emergency room, complaining that he had experienced left-sided chest pain for two to three days. (Tr. 236-37.)  Plaintiff's electrocardiogram ("EKG") results were abnormal, and heart catheterization and CT angiography revealed aortic dissection.[11] (*Id.* at 238, 242, 248, 256-57.)  Plaintiff was transferred to Lenox Hill Hospital, where Dr. Didier F. Loulmet surgically

---

[10] Mild degenerative spinal changes are generally insignificant and not disabling.

[11] Aortic dissection is a medical emergency involving a tear in the innermost of three layers of the aorta (the major artery carrying blood from the heart).

repaired the aortic dissection on May 11, 2007. (*See id.* at 254-55, 976.)

On May 15, 2007, CT angiography indicated that the repair was successful, and plaintiff was discharged in stable condition on May 16, 2007. (*Id.* at 251, 262-63, 945.) Plaintiff's doctor prescribed Lipitor and several anti-hypertensives, and recommended no heavy lifting or driving for six weeks. (*Id.* at 947.) Three months later, on August 27, 2007, an echocardiogram revealed mild or normal clinical findings, suggesting that plaintiff recovered well from the surgery. (*Id.* at 287.)

### 2. Elmhurst Hospital: Hospitalization for Pneumonia (October 2007)

On October 2, 2007, plaintiff was taken to Elmhurst Hospital from Rikers, complaining of right-sided chest pain (which plaintiff rated as 3/10) since the prior night. (Tr. 426-429.) After extensive cardiac testing, Dr. Iavicoli diagnosed pneumonia and prescribed an antibiotic. (*See id.* at 426-36.) All cardiac findings were within normal ranges, although an enlarged heart was noted. (*See id.*) The next day, plaintiff was discharged to Rikers in stable condition. (*Id.* at 436.)

### 3. JHMC Hospital: Hospitalization for Fever (December 2007)

From December 2 to 8, 2007, plaintiff was hospitalized at JHMC for shortness of breath, chest pain, and fever. (*See* Tr. 296.) He received conservative treatment (Motrin and Prednisone) for fever and instructions to see his doctor and exercise in moderation "[a]s tolerated for age." (*See id.*)

### 4. Grace Chow, M.D., Internist (May & June 2008)

On May 29, 2008, Dr. Chow diagnosed plaintiff with hypertension after recording plaintiff's elevated blood pressure at 126/96. (Tr. 1257.) By June 14, 2008, his blood pressure returned to normal at 126/78 because plaintiff was taking antihypertensives and aspirin as required. (*Id.* at 1254.)

### 5. Medical Examinations Conducted During Plaintiff's Incarceration at Rikers (October 8, 2008 – June 8, 2009)

On January 2, 2009, plaintiff was transported to Elmhurst Hospital complaining of chest pain and shortness of breath after vigorous exercise. (Tr. 452; *see* Part III.C.8 *supra*.) The ensuing physical and cardiac examination revealed normal findings, except for suspicion of rhabdomyolysis. (*See* Tr. 340, 343, 451-88.) Plaintiff was given ibuprofen and transferred to Bellevue Hospital. (*See id.*) Plaintiff was treated for rhabdomyolysis caused by over-exertion and advised not to lift weights for six weeks. (*Id.*)

On January 30, 2009, plaintiff's blood pressure was
significantly elevated, from 138/90 to 185/98.  (*Id.* at 358.)
Plaintiff was abusing cocaine, heroin, and alcohol at this time.
(*Id.* at 364.)  Plaintiff was prescribed antibiotics for an upper
respiratory infection.  (*Id.* at 359-62.)  His blood pressure was
normal (120/80) by February 3, 2009.  (*Id.* at 363.)  On February
20, 2009, plaintiff had no complaints and exhibited normal
medical findings and well-controlled hypertension (120/80).
(*Id.* at 407.)  Follow-up cardiac examination continued to show
that plaintiff's hypertension was effectively managed with
medication.  (*Id.* at 411.)

**E.    Treating Sources for Plaintiff's Mental Impairment**

**1.    Grace Chow, M.D., Internist (May 2008)**

On May 29, 2008, Dr. Chow diagnosed plaintiff with
depression with anxiety, based on plaintiff's report of insomnia
and depressive symptoms.  (Tr. 1257-58.)  Dr. Chow did not
prescribe antidepressants, but referred plaintiff to a
psychiatrist.  (*Id.*)

**2.    Robert Morrison, M.D., Internist (August &
        September 2008)**

On August 12, 2008, Dr. Robert Morrison, an internist,
examined plaintiff regarding his complaint of depressive
symptoms.  (Tr. 1248-49.)  Plaintiff claimed that his depression
began two or three months after his cardiac surgery (in July or

August 2007) and denied receiving any psychiatric treatment in the interim. (*Id.* at 1248.) Dr. Morrison observed that plaintiff was cooperative, alert, and oriented with normal speech and no psychomotor abnormality, but had a sad affect and vague suicidal ideation. (*Id.*) Dr. Morrison recorded a global assessment of functioning (GAF) of 50, which signifies serious symptoms and impairment in social or occupational functioning with anxiety. (*Id.* at 1249.) Dr. Morrison diagnosed a single episode of major depression without psychotic features and prescribed Benadryl for insomnia. (*Id.*) During a follow-up visit on September 2, 2008, Dr. Morrison replaced the Benadryl prescription with Celexa (an antidepressant), and then increased the dosage and added Ambien for insomnia on September 23, 2008. (*Id.* at 1245-46.)

### 3. Mental Health Examinations Conducted During Plaintiff's Incarceration at Rikers (October 8, 2008 – June 8, 2009)

During plaintiff's intake at Rikers, a mental status evaluation on October 13, 2008 revealed normal findings, except for plaintiff's history of depression and his concern about obtaining his cardiac and antidepressant medications while in prison. (Tr. 390-91.) Plaintiff reported that he was not experiencing any depression, anxiety, hallucination, or suicidal ideation at that time. (*Id.*) A social worker recorded a GAF of 65 current and 70 for the past year (a significant improvement

compared to Dr. Morrison's exam in August 2008).  (*Id.; see id.*
at 1249.)

On October 21, 2008, a psychosocial evaluation by
clinician Richelle Williams, M.A., revealed that plaintiff was
"fully functional" in self-care, activities of daily living,
social functioning, and task completion.  (*Id.* at 307.)
Plaintiff reported that his depression was well-controlled by
medication, and Ms. Williams recorded plaintiff's mental status
as normal in all categories except for insight, judgment, and
impulse control.  (*Id.* at 305, 307-08.)  Ms. Williams also
assessed a GAF of 85 current and 90 for the past, an improvement
from several weeks prior and a range indicating good function
with no or minimal symptoms.  (*Id.* at 308.)  Based on her
examination, Ms. Williams diagnosed mood disorder and antisocial
personality disorder.  (*Id.*)  In addition, a psychiatric
examination conducted on the same day revealed plaintiff's
mental state as functional and normal, although Dr. Ibrahim Syed
prescribed an antidepressant (Celexa) to improve plaintiff's
mood and anxiety.  (*Id.* at 312-14.)

On October 28, 2008, Dr. Bimalendu Ganguly, a
psychiatrist, concluded that plaintiff was stable and responding
well to antidepressant medication (Celexa).  (*Id.* at 315.)

On December 9, 2008, plaintiff informed social worker
Lionel Browne that he was doing well with medication.  (*Id.* at

323, 326-27.)  Mr. Browne concluded that plaintiff was mentally stable.  (*Id.* at 323.)  During a December 22, 2008 visit to a mental health clinic, plaintiff reported that he no longer felt depressed.  (*Id.* at 338.)

Several weeks later on January 19, 2009, however, Dr. Sneed increased plaintiff's Celexa dosage because plaintiff complained that he felt depressed again.  (*Id.* at 347.)  By February 11, 2009, plaintiff said he was "okay" and was described as positive, focused, and hopeful.  (*Id.* at 371.)

### 4. Drs. Chow and Morrison, Internists (June 2009 – November 2009)

On June 30, 2009, Dr. Chow renewed plaintiff's prescriptions for Celexa and Ambien.  (Tr. 1243-44)  On November 3, 2009, plaintiff reported depressive symptoms to Dr. Morrison and claimed he had not taken antidepressants for a year because his prescription had expired.  (*Id.* at 1231.)  Dr. Morrison renewed plaintiff's prescriptions, and plaintiff reported improvement on medication by November 17, 2009.  (*Id.* at 1229.)

### F. Medical Source Statements from Examining Physicians

### 1. Treating Physician Statement: Zoran Lasic, M.D., Cardiologist (June 2009)

Dr. Zoran Lasic, a treating cardiologist, submitted a medical source statement dated June 22, 2009.  (Tr. 503-06.)  He evaluated plaintiff's limitations based on diagnoses of

hypertension and status post aortic dissection repair.[12]  (*Id.* at

505)  Dr. Lasic opined that, in an eight-hour workday, plaintiff

could (1) sit for one hour continuously or for two hours with a

break; and (2) stand or walk for one hour continuously or for

two hours with a thirty-minute break.  (*Id.* at 503-04.)  Dr.

Lasic also stated that plaintiff needed to recline for four

hours in an eight-hour day and could occasionally lift a maximum

of five pounds.  (*Id.* at 503-05.)

     **2.  Consultative Physician Statement: Jonathan Wahl,
M.D., Internist (August 2007)**

Dr. Jonathan Wahl, an internist, performed a

consultative internal medicine examination on August 7, 2007.

(Tr. 282.)  Plaintiff complained of chest pain and dyspnea on

exertion (shortness of breath).  (*Id.*)  He was currently

asymptomatic, but stated that moderate exertion caused chest

discomfort in the past.  (*Id.*)  Dr. Wahl reviewed plaintiff's

medications and medical history of hypertension, aortic

dissection, and heart surgery.  (*Id.*)

Plaintiff reported a history of smoking and drinking

from 1980 to May 2007, but denied "street drug use."  (*Id.*)

Plaintiff also reported that he lived alone and completed

household chores like "cooking, cleaning and laundry" himself

_____

[12] A diagnosis of "status post aortic dissection repair" reflects the
physician's acknowledgement of plaintiff's medical history of aortic
dissection and surgical repair.

unless they required heavy lifting.  (*Id.*)  Plaintiff said that
he showered, bathed, and dressed without help.  (*Id.*)  He also
"watche[d] TV, listen[ed] to [music], read[], and socialize[d]."
(*Id.*)

Plaintiff's blood pressure was normal (140/80) and he
appeared in "no acute distress."  (*Id.* at 283.)  Plaintiff's
gait and stance were normal, his squat was full, and he could
walk on heels and toes without difficulty.  (*Id.*)  Plaintiff
used no assistive devices, rose from a chair without trouble,
and required no help in changing clothes or getting on and off
the examination table.  (*Id.*)

Dr. Wahl examined plaintiff's general appearance,
gait, skin, lymph nodes, head, face, eyes, ears, nose, throat,
neck, chest, lungs, heart, abdomen, musculoskeletal and
neurologic systems, extremities, and fine motor activity of
hands.  (*Id.* at 283-84.)  Plaintiff's heart had a regular
rhythm, and his cervical spine, shoulders, elbows, forearms,
wrists, hips, knees, and ankles showed full range of motion.
(*Id.*)  The lumbar spine had full flexion, extension, and lateral
flexion bilaterally, but rotation to 30 degrees yielded
discomfort at the sternum (not the back) bilaterally.  (*Id.*)
Plaintiff's straight leg raising was not limited on either side,
muscle strength was full (5/5) in all extremities, and deep
tendon reflexes were normal and equal.  (*Id.*)  No motor or

sensory deficits were noted. (*Id.*)  Dr. Wahl diagnosed

asymptomatic chest pain, hypertension, dyspnea on exertion, and

status post aortic dissection repair.  (*Id.*)

Dr. Wahl's Medical Source Statement stated the

following conclusion:

> Marked limitation for the frequent or the prolonged
> weight-bearing or carrying loads considered to be
> greater than moderate.  He should avoid intense
> strenuous activities or exercise.  He should avoid
> environments known to have dust and respiratory
> irritants.  Given the history of median [sternotomy],
> and the chest wall pain with rotary movements over 30
> degrees bilaterally, he has a moderate limitation for
> this particular activity.

(*Id.* at 285.)

## G.   Medical Source Statements from Non-Examining Consultants

### 1.   State Disability Agency Medical Consultant Evidence: A. Slovis, M.D., Cardiologist (September 2007)

On September 17, 2007, Dr. Slovis, a cardiologist and

state agency medical consultant,[13] submitted a non-examining

assessment of plaintiff's RFC, based on his review of the

medical evidence on record, including plaintiff's spinal x-rays

(October 2006), history of hypertension, surgery for aortic

dissection (May 2007), initial consultative exam (August 2007),

---

[13] Dr. Slovis submitted the medical source statement to A. Aduroja, an analyst
at the New York State Division of Disability Determinations.  (Tr. 294.)
Dr. Slovis has the "MC" (Medical Consultant) specialty designation required
to submit such a statement.  (*See id.*)  Based on this statement, the
Disability Determination Services determined that plaintiff was capable of
performing medium work.  (*Id.* at 25.)

and post-operative echocardiogram (August 2007).  (Tr. 288-95.)
Dr. Slovis noted that, post-operatively, plaintiff appeared
asymptomatic and exams tended to show benign or normal clinical
findings.  (*Id*. at 289.)  Because plaintiff had recently
complained of pain only at the surgical site (*see id*. at 283),
Dr. Slovis opined that any limitation in daily living stemmed
from recent surgery and would not persist for twelve months.
(*Id*. at 289-91.)  Dr. Slovis concluded that plaintiff retained
the ability to lift and carry fifty pounds occasionally, lift
and carry twenty-five pounds frequently, and stand or walk for
six hours in an eight-hour workday.  (*Id*. at 289, 294.)  He also
stated that "[b]ased on evidence, [plaintiff] would at best be
restricted from heavy lifting and equally strenuous work
activity."  (*Id*. at 289-90.)

### 2.    Medical Expert Evidence: Louis Lombardi, M.D., Orthopedic Surgeon (September 2009)

Dr. Lombardi, an orthopedic surgeon and medical
expert, submitted consultative medical interrogatories to the
ALJ, based on his review of the medical evidence from October
20, 2006 to September 17, 2009.  (Tr. 933-37.)  Dr. Lombardi
concluded, on September 17, 2009, that plaintiff's impairments
did not meet or equal the Listing of Impairments based on the
following analysis.  (*Id*. at 934.)

First, plaintiff's aortic dissection was repaired with successful surgery, plaintiff recovered well, and he did not appear to suffer persistent limitations from that condition. (*Id.*) Second, plaintiff recovered from rhabdomyolysis, which was an acute incident without long-term impact on RFC. (*Id.*) Third, clinical findings regarding plaintiff's neck and back pain did not meet the Medical Listing requirements because (1) the January 8, 2007 diagnosis of three herniated discs was too general to satisfy the Medical Listing without corroborative clinical findings, such as stenosis or nerve impingement (*see id.* at 24), (2) the record lacked evidence of nerve involvement (no weakness in wrist extension or foot eversion, sensory loss, muscle atrophy, or tendon reflex deficits) (*id.*), and (3) plaintiff exhibited normal motor and sensory findings and neurological examination on August 7, 2007 (Dr. Wahl's consultation) and October 2, 2007 (Elmhurst Hospital visit). (*Id.* at 935-36.) In sum, Dr. Lombardi detected no longitudinal patterns of orthopedic compromise or impairment. (*Id.* at 935.)

Upon reviewing the medical evidence, Dr. Lombardi also noted limitations in Dr. Lasic's and Dr. Shusterman's evaluations of plaintiff. (*Id.* at 936.) Specifically, Dr. Lasic's RFC assessment (*see id.* at 503-06) appeared to be based only on medical (hypertension and past aortic dissection repair) limitations, without regard to orthopedic limitations. (*Id.* at

936.)  Additionally, Dr. Shusterman's clinical examinations and reports were not comprehensive enough to conclude that plaintiff was disabled.  (*Id.*)  Notably, he recorded uneven gait without specifying which side and a decrease in brachioradialis and patellar tendon reflexes without quantifying or evaluating symmetry.  (*Id.*)  Dr. Shusterman also failed to quantify range of motion in the thorax and neck and he did not indicate what symptoms limited spinal range of motion when he did measure it. (*Id.*)

In conclusion, Dr. Lombardi opined that "from an orthopedic standpoint," plaintiff should be able to sit six hours, stand/walk for four hours (with rest periods), and lift/carry up to five pounds.  (*Id.* at 937.)  He declined to comment on plaintiff's limitations from depression and substance abuse, due to lack of specific expertise.  (*Id.*)

### 3. Vocational Expert Evidence: Andrew Pasternak (October 2009)

Andrew Pasternak, a vocational expert, responded to an interrogatory on October 14, 2009.  (Tr. 194-98.)  The ALJ asked Mr. Pasternak to hypothesize about the work abilities of an individual "able to communicate in English" with a "limited education" and a "residual functional capacity (RFC) to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b), except [t]he hypothetical individual is able to lift and carry

up to 5 lbs, can sit for 6 hours out of 8 and stand/walk for 4
hours out of 8." (*Id*. at 196.)  Mr. Pasternak testified that an
individual with such limitations could not perform plaintiff's
past work, but that there were other jobs available in the
national economy that such an individual could perform.  (*Id*. at
196-97.)  Specifically, Mr. Pasternak cited the jobs of ticket
taker, machine tender, jewelry-silver preparer, and atomizer,
rotor, or compact assembler.  (*Id*. at 197.)

## DISCUSSION

### IV. Standard of Review

"A district court may set aside the [ALJ's]
determination that a claimant is not disabled only if the
factual findings are not supported by 'substantial evidence' or
if the decision is based on legal error."  *Burgess*, 537 F.3d at
127 (internal citations omitted).  "Substantial evidence is
'more than a mere scintilla.  It means such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion.'"  *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.
2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

An evaluation of the "substantiality of the evidence
must also include that which detracts from its weight."
*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir.
1988).  If substantial evidence exists in the record to support
the Commissioner's factual findings, they are conclusive and

must be upheld.  *See* 42 U.S.C. § 405(g).  Accordingly, the reviewing court "may not substitute its own judgment with that of the [ALJ], even if it might justifiably have reached a different result upon a *de novo* review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

**V. Determining Whether a Claimant is Disabled**

A claimant is disabled under the SSA when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work [that] exists in the national economy."  *Id.* at § 423(d)(2)(A).

The SSA has promulgated a five-step sequential analysis to determine whether the claimant's condition meets the Act's definition of disability:

[I]f the Commissioner determines (1) that the claimant is not working,[14] (2) that he has a 'severe impairment,'[15] (3) that the impairment is not one [listed in Appendix 1 of the SSA Regulations (the "Regulations")] that conclusively requires a determination of disability,[16] and (4) that the claimant is not capable of continuing in his prior type of work,[17] the Commissioner must find [the claimant] disabled if (5) there is not another type of work that claimant can do.[18]

*Burgess*, 537 F.3d at 120 (citation omitted); *see* 20 C.F.R. § 404.1520(a)(4).

In performing this five-step evaluation, the Commissioner must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (summary order) (citing 20 C.F.R. § 404.1523). Further, if the Commissioner "do[es] find a medically severe combination of impairments, the combined impact of the impairments will be

---

[14] Under the first step, if the claimant is currently engaged in "substantial gainful employment," the claimant is not disabled, regardless of the medical findings. 20 C.F.R. § 404.1520(b); *see id.* § 404.1520(a)(4)(i).

[15] Under the second step, the claimant must have "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities" in order to have a severe impairment. 20 C.F.R. § 404.1520(c); *see id.* § 404.1520(a)(4)(ii).

[16] Under the third step, if the claimant has an impairment that meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, the claimant is *per se* disabled. 20 C.F.R. § 404.1520(d); *see id.* § 404.1520(a)(4)(iii).

[17] Under the fourth step, the claimant is not disabled if he or she can still do his or her "past relevant work." 20 C.F.R. § 404.1520(f); *see id.* § 404.1520(a)(4)(iv).

[18] Under the fifth step, the claimant may still be considered not disabled if he or she "can make an adjustment to other work" available in the national economy. 20 C.F.R. § 404.1520(g); *see id.* § 404.1520(a)(4)(v).

considered throughout the disability determination process."
*Id.* (citing 20 C.F.R. § 416.945(a)(2)).

In steps one through four of the sequential five-step framework, the claimant bears the "general burden of proving . . . disability." *Burgess*, 537 F.3d at 128. In step five, the burden shifts from the claimant to the Commissioner, requiring the Commissioner to show that, in light of the claimant's RFC, age, education, and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 303 (E.D.N.Y. 1997).

## VI. The ALJ's Disability Determination

At step one, the ALJ determined that plaintiff has not engaged in substantial gainful activity since October 20, 2006, his alleged onset date. (Tr. 14.)

At step two, the ALJ found that plaintiff has a severe combination of impairments, including obesity, a cardiac impairment with findings including an enlarged heart, rhabdomyolysis,[19] status post aortic dissection repair, hypertension, degenerative disc disease of the cervical and lumbar spine, depression, anxiety, and a history of substance abuse. (*Id.* at 15.)

---

[19] Rhabdomyolysis is the acute breakdown of muscle fibers into the bloodstream due to a muscle tissue injury. (*Id.* at 332.)

At step three, the ALJ found that plaintiff lacks an impairment or combination of impairments that meets or is medically equal to a listed impairment in Appendix 1 of the Regulations that would conclusively require a disability determination. (*See id*. at 15-17.)[20]

At step four, the ALJ found that plaintiff is unable to perform any past relevant work because it would exceed his RFC for sedentary work. (*Id*. at 26.) In determining that plaintiff retains the RFC to perform a broad range of sedentary work, the ALJ found that plaintiff could "lift/carry and push/pull up to 5 pounds, stand/walk for 4 hours, and sit for 6 hours" in an eight-hour work day. (*Id*. at 17.) He acknowledged that plaintiff must avoid concentrated exposure to respiratory irritants; proximity to dangerous machinery; and climbing ladders, ropes, and scaffolds. (*Id.*) The ALJ also noted that plaintiff is "limited to understanding, remembering and carrying out short, simple instructions and making simple work related decisions." (*Id.*)

At step five, the ALJ found that, in light of plaintiff's age, education, work experience, and RFC, jobs exist in significant numbers in the economy that plaintiff can

---

[20] The ALJ analyzed each condition against the relevant Medical Listing in sections 1.00 (musculoskeletal system), 4.00 (cardiovascular system), or 12.00 (mental disorders) of the Regulations. (*See* Tr. 15-17.)

perform.  (*Id.* at 26-28.)  Thus, the ALJ concluded that
plaintiff is not disabled.  (*Id.* at 28.)

In determining that plaintiff retains the RFC to
perform a broad range of sedentary work, with the limitations
noted above, the ALJ accorded "significant weight" to the
medical expert Dr. Lombardi "because, although he did not
personally examine the claimant, the medical expert's opinion is
consistent with the overall record."  (*Id.* at 25.)  The ALJ
further explained that Dr. Lombardi is "a specialist in
orthopedic surgery and familiar with the Commissioner's
disability program."  (*Id.*)  The ALJ also gave "considerable
weight" to Dr. Wahl's consultative opinion "because he is a duly
qualified physician who personally examined the claimant."
(*Id.*)

The ALJ accorded "limited weight" to treating
physician Dr. Shusterman's conclusion that plaintiff is "totally
disabled" because such statements (1) represent "conclusions of
law on the ultimate issue of disability reserved to the
Commissioner"; (2) "fail to provide specific limitations"; and
(3) are "otherwise inconsistent with the record as a whole."
(*Id.*)  In addition, the ALJ attributed "limited weight" to
treating physician Dr. Lasic's medical source statement
"because, although he is a treating source, the restrictions he

noted are not consistent with or supported by his treatment notes and the overall record." (*Id.*)

Finally, although the ALJ recognized that plaintiff's medically determinable impairments could cause his alleged limitations and symptoms of pain, the ALJ gave "limited weight" to plaintiff's "statements concerning the intensity, persistence and limiting effects" of such symptoms because they were "inconsistent with the medical record as a whole." (*Id.* at 18.)

## VII. The Parties' Cross-Motions for Judgment on the Pleadings

### A.    Plaintiff's Cross-Motion

Plaintiff cross-moves for judgment on the pleadings, arguing that the Commissioner's decision should be reversed because it was reached through legal error and is not supported by substantial evidence. (ECF No. 25, Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem.") at 1.)

First, plaintiff argues that the ALJ failed to provide a "detailed and reasoned" rationale for the weight assigned to the medical source opinions. (*Id.* at 12.)  Specifically, plaintiff challenges the ALJ's decision to rely heavily on Dr. Lombardi's opinion, but to attribute limited weight to statements made by treating physicians Drs. Shusterman and Lasic. (*Id.* at 13.)  Plaintiff further claims that Dr.

Lombardi's assessment was too limited in scope and not based on substantial evidence. (*Id.* at 9.)

Plaintiff also argues that, pursuant to the ALJ's duty to develop the record, the ALJ should have re-contacted the treating physicians before assigning limited weight to their opinions. (*Id.* at 8-14.) In plaintiff's view, given the ALJ's concerns about "completeness and reliability" of the treating physicians' reports, "[ALJ Lahat] was required to make a reasonable attempt to obtain adequately detailed and updated medical source statements" from those doctors. (*Id.*)

Plaintiff contends that ALJ Lahat further erred by finding plaintiff's testimony not fully credible without adequate explanation, and that the ALJ failed to "provide the required detailed credibility analysis utilizing all the criteria in SS 96-7p and 20 C.F.R. 404.1529." (*Id.* at 8, 16.)

Finally, plaintiff argues that the ALJ did not satisfy the Commissioner's burden at step five of the sequential analysis to perform a "function by function" assessment of plaintiff's abilities, as required by Social Security Ruling 96-8p, before determining that plaintiff could perform sedentary work. (*Id.* at 14-17.)

B.   **Defendant's Cross-Motion**

Defendant moves for judgment on the pleadings and urges the court to affirm the Commissioner's decision. (ECF No.

23, Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Mem.") at 1.) Defendant argues that the ALJ applied the correct legal standards and properly found, based on substantial evidence, that plaintiff was not disabled. (*Id.*)

Defendant argues that the ALJ properly considered and correctly gave little weight to the opinions of treating physicians Drs. Shusterman and Lasic, and that "the record was replete with substantial evidence for the ALJ's conclusion that [p]laintiff could do sedentary work, and which contradicted Dr. Shusterman's opinions." (ECF No. 26, Memorandum of Law in Further Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings ("Def. Reply") at 2; *see, e.g.*, Def. Mem. at 32-34.) Furthermore, defendant contends that substantial evidence contradicts Dr. Lasic's opinions about plaintiff's cardiac limitations. (Def. Reply at 2; *see* Def. Mem. at 31-32.)

Defendant further argues that the ALJ was not required to re-contact plaintiff's treating physicians before assigning little weight to their opinions, because the ALJ possessed a "complete medical record without clear or obvious gaps." (Def. Reply at 3.) Defendant also submits that the ALJ properly considered plaintiff's testimony and correctly exercised

discretion in finding that plaintiff was not entirely credible. (*Id.* at 5; *see* Def. Mem. at 37-38.)  Finally, defendant argues that the ALJ applied the correct standards and met the Commissioner's burden at step five, because the ALJ made specific findings regarding plaintiff's RFC to support the ALJ's decision that plaintiff could perform sedentary work.  (Def. Reply at 3-5.)

## VIII. Analysis

### A.   The ALJ's Evaluation of Medical Opinions from Consulting Doctors and Treating Physicians

When an ALJ must weigh conflicting medical evidence, the treating physician rule "mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence."  *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also* 20 C.F.R. §§ 404.1527(c)(2), 404.1527(d)(2), 416.927(c)(2).  According to the Regulations, the opinions of treating physicians deserve controlling weight because "'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . .'"  *Balodis v.*

*Leavitt*, 704 F. Supp. 2d 255, 264 (E.D.N.Y. 2010) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).

It also well-settled, however, that a treating doctor's opinion will be given less weight when it is less consistent with the record as a whole. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(c)(4)). Moreover, under the Regulations, opinions of non-treating and non-examining doctors can override those of treating doctors as long as they are supported by evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)).

Where a treating physician's opinion regarding the nature and severity of a claimant's disability is not afforded "controlling" weight, however, the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33) (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion."); *Schaal*, 134 F.3d at 505 (holding that the failure to provide "good reasons" for rejecting a treating physician's opinion constituted legal error). While the Regulations do not explicitly or exhaustively define "good reasons," the following

factors may guide an ALJ in determining what weight to assign a treating source opinion: "(1) the length, frequency, nature, and extent of the treating relationship, (2) the supportability of the treating source opinion, (3) the consistency of the opinion with the rest of the record, (4) the specialization of the treating physician, and (5) any other relevant factors." *Scott v. Astrue*, No. 09-CV-3999, 2010 U.S. Dist. LEXIS 68913 at *33-34 (E.D.N.Y. July 9, 2010); *see* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

Although the SSA considers opinions from treating physicians regarding the RFC and disability of a claimant, "the final responsibility for deciding issues relating to disability is reserved to the Commissioner," not to physicians. *Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009) (summary order). The opinion of a treating source on such matters is thus not given "controlling weight" or "special significance" under the Regulations. *Arruda v. Comm'r of Soc. Sec.*, 363 F. App'x 93, 95-96 (2d Cir. 2010) (summary order); *see also* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."); *Snell*, 177 F.3d at 133 ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

In fact, "[t]he Commissioner is not required, nor even necessarily permitted, to accept any single opinion, even that of a treating physician, as dispositive on the determination of disability." *Francois v. Astrue*, No. 09-CV-6625, 2010 U.S. Dist. LEXIS 61456, at *17-18 (S.D.N.Y. June 18, 2010) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2008)). Rather, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing *Richardson*, 402 U.S. at 399). Notwithstanding, the ALJ may not "arbitrarily substitute his own judgment for competent medical opinion." *Balasmo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted).

Moreover, an ALJ's failure to reconcile materially divergent RFC opinions of medical sources is a ground for remand. *Caserto v. Barnhart*, 309 F. Supp. 2d 435, 445 (E.D.N.Y. 2004); *see Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citation omitted) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ . . . but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence."). Plaintiff argues that the ALJ erred in weighing the medical source opinions in the record and did not provide good reasons for the weight assigned. (Pl. Mem. at 12.)

**1. The ALJ Properly Accorded "Limited Weight" to Treating Physician Dr. Shusterman's Disability Conclusion**

Dr. Shusterman, a treating physician for plaintiff's back impairment, noted on many treatment reports that plaintiff was "totally disabled." (*See, e.g.*, Tr. 19.) The ALJ assigned Dr. Shusterman's statements of total disability "limited weight" because they (1) represented "conclusions of law" reserved expressly to the Commissioner, (3) "fail[ed] to provide specific limitations," and (3) were "otherwise inconsistent with the record as a whole." (*Id.* at 25.) Notably, the ALJ accorded limited weight *only* to Dr. Shusterman's conclusion regarding disability. The ALJ properly incorporated Dr. Shusterman's treatment reports into the medical evidence upon which the ALJ based his overall determination. (*See id.* at 18-19.)

Although Dr. Shusterman treated the plaintiff for approximately two years, the ALJ correctly noted that Dr. Shusterman's opinion regarding disability is a legal conclusion not entitled to special weight. *Arruda*, 363 F. App'x at 95–96. Thus, the ALJ applied the correct legal standard by assigning limited weight to Dr. Shusterman's conclusion, reviewing the medical evidence, and explaining that the record as a whole does not support a finding of disability.

Furthermore, substantial evidence supports the ALJ's decision to disregard Dr. Shusterman's conclusion that plaintiff

was disabled.  As the ALJ explained, Dr. Shusterman's examinations revealed clinical findings that support an absence of disability, not total disability.  Specifically, Drs. Shusterman and Rosenblatt both ruled out serious nerve root damage (radiculopathy) that may qualify as a disabling condition.  (Tr. 872-73, 889.)  Moreover, the results of MRI scans, electrodiagnostic studies, and Dr. Shusterman's examinations reflected an absence of muscle atrophy or nerve involvement (*Id*. at 19, 23), and x-rays revealed only mild degenerative disc disease.  (*Id*. at 18.)

Upon reviewing plaintiff's medical records, Dr. Lombardi noted the limitations of Dr. Shusterman's reports and the absence of any meaningful evidence that plaintiff suffered from long-term neurological deficits.  (*Id*. at 24, 933-37.)  Dr. Lombardi also concluded that the record revealed no longitudinal patterns of orthopedic compromise.  (*Id.*)

In addition, when Dr. Wahl examined plaintiff on August 7, 2007, plaintiff reported no back pain and exhibited normal nerve function and full spinal range of motion.  (*Id*. at 283.)  Similarly, an examination at Elmhurst Hospital on October 2, 2007 revealed normal neurological and motor findings.  (*Id*. at 420.)  Notwithstanding, on July 11, August 21, and November 12, 2007 (before and after those examinations), Dr. Shusterman continued to report - in contradiction to the other physicians'

reports – that plaintiff experienced persistent back pain and a limited range of motion. (*Id*. at 903-06.) The ALJ appropriately exercised his authority in resolving this conflict in favor of the weight of the medical evidence and against Dr. Shusterman's opinion. *See Veino*, 312 F.3d at 588 ("The record plainly contained conflicting [medical] evaluations of [plaintiff's] present condition, and it was within the province of the ALJ to resolve that evidence in the way she did.").

The ALJ also noted that plaintiff's treating physicians, including Dr. Shusterman, concluded that plaintiff's back pain required only conservative treatment (muscle relaxants, ibuprofen, a Lidocaine patch, and physical therapy). The limited medical care and conservative treatment plaintiff received also weighed against a finding of disability. (Tr. 24.) Given the standard of review regarding substantial evidence, this court need only determine that, based on substantial evidence in the record, the ALJ could reasonably have concluded that plaintiff was not disabled. *See Halloran*, 362 F.3d at 31. Because the ALJ provided a sufficient basis for ascribing limited weight to Dr. Shusterman's opinion regarding plaintiff's disability, this issue is not a ground for remand.

### 2. The ALJ Properly Ascribed "Limited Weight" to Treating Physician Dr. Lasic's Medical Source Statement

Dr. Lasic, one of plaintiff's treating cardiologists, submitted a medical source statement assessing plaintiff's RFC based on diagnoses of hypertension and status post aortic dissection repair. (Tr. 505.) Dr. Lasic opined that, in an eight-hour workday, plaintiff could sit for two hours, stand or walk for two hours, and lie down for four hours. (*Id*. at 503-04.) In addition, Dr. Lasic concluded that plaintiff could occasionally lift a maximum of five pounds. (*Id*. at 505.) The ALJ assigned "limited weight" to Dr. Lasic's medical source statement because "the restrictions he noted are not consistent with or supported by his treatment notes and the overall record." (*Id*. at 25.)

Substantial evidence in the record contradicts Dr. Lasic's opinion and supports the ALJ's analysis and conclusion. The record shows that plaintiff's aortic dissection repair was successful and that plaintiff recovered within three months. (*Id*. at 287.) In addition, although plaintiff experienced persistent limitations in heavy lifting and strenuous exercise (*see id*. at 285 (Dr. Wahl's medical source statement)), these limitations would not limit plaintiff's ability to do sedentary work.

Similarly, plaintiff's hypertension does not limit plaintiff's ability to work because it is well-controlled by medication. (*See id*. at 363, 407, 411.) Although plaintiff has occasionally complained of chest pain, it stemmed either from unrelated acute illnesses—pneumonia and rhabdomyolysis caused by rigorous exercise, heavy weight-lifting, and overexertion, not from a severe impairment. Thus, although Dr. Lasic is a treating physician, his opinion was not entitled to controlling weight because it is inconsistent with the overall record. *See Snell*, 177 F.3d at 133 (citing 20 C.F.R. § 404.1527(c)(4)). Rather, the totality of the medical evidence supports the ALJ's determination that plaintiff may experience some limiting symptoms due to his cardiac impairments, but remains capable of performing sedentary work.

Moreover, the ALJ fulfilled his duty to weigh conflicting medical evidence and reconcile materially divergent RFC opinions. *See Veino*, 312 F.3d at 588 (duty to balance conflicting evidence); *Caserto*, 309 F. Supp. 2d at 445 (duty to reconcile materially divergent RFC opinions). Although Dr. Lasic opined that plaintiff suffered significant functional limitations that would impair his ability to work, Drs. Wahl (internist) and Slovis (cardiologist) concluded that plaintiff

retained greater function than Dr. Lasic stated.[21] (*See* Tr. 282-85, 288-95.) Because the record supports the opinions of Drs. Wahl and Slovis, the ALJ was entitled to credit those opinions over treating physician Dr. Lasic. *See Schisler*, 3 F.3d at 568 (non-treating and non-examining physician opinions can override those of treating doctors as long as the record supports them). In sum, the ALJ properly weighed the medical evidence and adequately explained the weight afforded to Dr. Lasic's opinion and the rationale for that determination.

### 3. The ALJ Correctly Accorded "Significant Weight" to Medical Expert Dr. Lombardi's Opinion

The ALJ accorded "significant weight" to Dr. Lombardi's expert opinion because it was "consistent with the overall record" and Dr. Lombardi is "a specialist in orthopedic surgery and familiar with the Commissioner's disability program." (Tr. 25.) Plaintiff argues that the ALJ erred in assigning significant weight to the consultative opinion of Dr. Lombardi because Dr. Lombardi did not examine plaintiff, gave an opinion unsupported by substantial evidence, and had expertise only in orthopedic medicine.[22] (Pl. Mem. at 9-10, 13-14.)

---

[21] Dr. Slovis essentially concluded that plaintiff possessed the RFC to perform medium work. *See supra* Part G.1 n.14. Similarly, Dr. Wahl concluded that plaintiff had a marked limitation for frequent or prolonged carrying of loads "greater than moderate." (Tr. 285.)

[22] Plaintiff also suggests that "[t]here is no clear showing that [Dr. Lombardi] had been provided with a complete record . . . ." (Pl. Mem. at

The Second Circuit has held that if the record
supports a consultative, non-examining medical opinion, the ALJ
may accord that opinion greater weight than the opinion of a
treating physician. *Schisler*, 3 F.3d at 568 (citing 20 C.F.R.
§§ 404.1527(e), 416.927(e)). As defendant points out, the
record here is "replete" with evidence – much of it cited
explicitly in Dr. Lombardi's opinion – that supports Dr.
Lombardi's conclusion and RFC assessment. (Def. Reply at 2;
*see, e.g.*, Tr. 12, 282-285, 933-37.) Specifically, the record
supports Dr. Lombardi's conclusion that plaintiff did not suffer
a long-term disabling orthopedic impairment.[23] For example,
plaintiff received conservative treatment for his back pain and
currently self-medicates with ibuprofen a few times per week,
suggesting that his back pain is not disabling. The record also
supports Dr. Lombardi's conclusion that plaintiff's cardiac
conditions, although serious, are either resolved or well-
controlled with medication.[24] Because substantial evidence
supports Dr. Lombardi's assessment, the ALJ was entitled to
credit his opinion even though Dr. Lombardi did not personally

---

7.) He argues that Dr. Lombardi "did not expressly refer to the evidence
he relied upon to reach his conclusions." (*Id.* at 9-10.)

[23] *See* Part VIII.A.1 *supra* for evidence from the record supporting Dr.
Lombardi's conclusion and showing a lack of clinical findings (such as
nerve impairment) corroborative of orthopedic impairment.

[24] *See* Part VIII.A.2 *supra* for evidence from the record showing that
plaintiff's hypertension is well-controlled, that plaintiff recovered
quickly from his aortic dissection repair, and that plaintiff's ability to
perform sedentary work is not limited.

examine plaintiff. *See Schisler*, 3 F.3d at 568 (noting that under the Regulations, opinions of non-treating and non-examining doctors can override those of treating doctors as long as they are supported by evidence in the record).

In addition, the record shows that Dr. Lombardi reviewed all of plaintiff's medical records and cited explicitly to several physicians' opinions and hospital records. (Tr. 933-37.) In addition to noting plaintiff's orthopedic and other medical history, Dr. Lombardi also mentioned evidence of plaintiff's depression and substance abuse, confirming that he conducted a comprehensive review of plaintiff's medical records. (*Id.*) When explaining the weight given to Dr. Lombardi's opinion, the ALJ acknowledged the doctor's orthopedic expertise and the scope of his assessment by "not[ing] that additional limitations were found based on the totality of the evidence and considering the non orthopedic impairments as well."[25] (*Id.* at 25.) Because the ALJ accounted for potential limitations in Dr. Lombardi's assessment, these do not constitute grounds for remand.

In addition, the ALJ explained other reasons, including Dr. Lombardi's expertise and familiarity with the Commissioner's disability program, for assigning significant

---

[25] *See, e.g.*, *id.* at 25, where the ALJ added mental limitations to his RFC conclusion with regard to plaintiff's mental impairments, for which Dr. Lombardi did not account.

weight to the medical expert's opinion.  In sum, the ALJ adequately explained the weight given to Dr. Lombardi's opinion and the ALJ's decision is supported by substantial evidence in the record.

## B.    The ALJ's Affirmative Duty to Develop the Record

"'[B]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'" *Burgess*, 537 F.3d at 128 (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see* 20 C.F.R. § 702.338.  Pursuant to the ALJ's duty to develop the administrative record, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative records." *Rosa*, 168 F.3d at 79 (citing *Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.")).

Thus, if an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (finding that an ALJ's obligation to develop the record in a hearing exists independently of the claimant's obligation to present evidence

on his or her own behalf); *see Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").

Moreover, a treating physician's "failure to include [proper] support for the findings in his report does not mean that such support does not exist; he might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case." *Rosa*, 168 F.3d at 80; *see also* 20 C.F.R. §§ 404.1512(e)(1); 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.").

Although an ALJ must seek out clarifying information from physicians whose opinions the ALJ discounts if there is a gap in the record, ALJ Lahat possessed a complete medical record without clear or obvious gaps. The ALJ subpoenaed comprehensive medical records from Dr. Shusterman and all known treating physicians and compiled a voluminous record. This is not a case in which the ALJ had a singular conclusory statement from a

treating physician that required elaboration or clarification. Rather, the ALJ had access to and reviewed every treatment record from plaintiff's visits to Dr. Shusterman.

In according limited weight to Dr. Shusterman's opinion, the ALJ did rely, at least in part, on the fact that specific limitations and clinical findings were absent from Dr. Shusterman's treatment reports. (*See* Tr. 23-25.) There was no "gap" in the record; rather, there was an absence of evidence of neurological deficits and a corresponding lack of meaningful clinical markers of total disability. Consequently, the ALJ was not required to seek additional information. *See Alachouzos v. Commissioner*, No. 11-CV-1643, 2012 U.S. Dist. LEXIS 23334, at *18 (E.D.N.Y. Feb. 23, 2012) (rejecting argument that "if the treating physician's conclusions are unsupported by medical evidence, then the ALJ's duty to complete the record entails going out and developing more evidence until there is a basis for the treating physician's conclusions.").

Moreover, Dr. Shusterman's reports were not internally inconsistent. In fact, his records were very similar from one visit to the next. Thus, the ALJ was not required to re-contact Dr. Shusterman before according limited weight to Dr. Shusterman's conclusion that plaintiff was disabled.

**C.    The ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff's statements of pain or other symptoms cannot, without more, serve as conclusive evidence of disability. *See Francois*, 2010 U.S. Dist. LEXIS 61456, at *7 (citing 42 U.S.C. § 423(d)(5)(A)).  The ALJ must therefore follow a two-step process to evaluate a claimant's assertions of pain and other symptoms.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

First, the ALJ must consider whether the claimant has a medically determinable impairment, which could reasonably be expected to produce the pain or symptoms alleged by the claimant.  20 C.F.R. §§ 404.1529(b), 416.929(b).  Second, if the claimant does suffer from an impairment that could reasonably be expected to produce the alleged pain or symptoms, the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his] capacity for work."  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

If the claimant offers statements about pain or other symptoms that are not substantiated by objective medical evidence, "the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary

order) (citing 20 C.F.R. § 404.1529(c)(3)).[26] "An ALJ's finding

that a witness lacks credibility must be 'set forth with

sufficient specificity to permit intelligible plenary review of

the record.'" *Morrison v. Astrue*, 08-CV-2048, 2010 U.S. Dist.

LEXIS 115190, at *12 (E.D.N.Y. Oct. 27, 2010) (quoting *Williams*,

859 F.2d at 261).

    The ALJ is required to "consider all of the evidence

in the record and give specific reasons for the weight accorded

to the claimant's testimony," taking into account the factors

enumerated in 20 C.F.R. § 404.1529(c)(3). *Alcantara v. Astrue*,

667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citing SSR 96-7p, 1996

SSR LEXIS 4, *8, at *3). Because the ALJ has "the benefit of

directly observing a claimant's demeanor and other indicia of

credibility," his decision to discredit subjective testimony may

not be disturbed on review if his disability determination is

supported by substantial evidence. *Brown v. Astrue*, No. 08-CV-

3653, 2010 U.S. Dist. LEXIS 62348, at *6 (E.D.N.Y. June 22,

2010); *see Aponte v. Sec'y, Dep't of Health & Human Servs*., 728

F.2d 588, 591 (2d Cir. 1984) ("If the Secretary's findings are

---

[26] "That credibility inquiry implicates seven factors to be considered,
including: (1) the claimant's daily activities; (2) the location, duration,
frequency, and intensity of the pain; (3) precipitating and aggravating
factors; (4) the type, dosage, effectiveness, and side effects of any
medications taken to alleviate the pain; (5) any treatment, other than
medication, that the claimant has received; (6) any other measures that the
claimant employs to relieve the pain; and (7) other factors concerning the
claimant's functional limitations and restrictions as a result of the
pain." *Meadors*, 370 F. App'x at 184 n.1 (quoting 20 C.F.R. §
404.1529(c)(3)(i)(vii)).

supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal citations omitted).

Here, the ALJ did not err in assessing plaintiff's credibility. Pursuant to the aforementioned two-step process, the ALJ found that: (1) plaintiff's medically determinable impairments could cause his alleged symptoms, but that (2) "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are given limited weight to the extent they are inconsistent with the medical record as a whole." (Tr. 18.) The ALJ emphasized that "the medical records simply fail to confirm the accuracy of the claimant's assertions and hearing testimony." (*Id.* at 24.) The ALJ therefore found plaintiff's testimony not fully credible and assigned "limited weight" to plaintiff's testimony at the hearing. (*Id.* at 25.)

Plaintiff argues that the ALJ's credibility finding is not supported by substantial evidence. (Pl. Mem. at 17.) Pursuant to 20 C.F.R. 404.1529(c)(3), however, the ALJ highlighted plaintiff's medical treatment, medications, and daily activities in support of his finding. (Tr. 24-25.) Regarding plaintiff's alleged back impairment, the ALJ explained that plaintiff "obtained very limited care for his back complaints and currently takes nothing more than over the

counter pain medications." (*Id.* at 24; *see id.* at 57 (ibuprofen twice a week relieves plaintiff's back pain.))

The ALJ also noted that plaintiff's aortic dissection and cardiac impairment did not manifest until May 2007, approximately seven months after plaintiff stopped working and alleged disability due to his back impairment. (*Id.* at 24-25.) After cardiac surgery, plaintiff's treatment has been "conservative," and medications that are ordinary in type and dosage have been effective without adverse side effects. (*Id.* at 25.) *See Joseph v. Astrue*, 09cv-4208, 2011 U.S. Dist. LEXIS 113634, at *25-26 (E.D.N.Y. September 30, 2011) (holding an ALJ credibility finding adequate where it included similar language, such as "medications have not been unusual for either type or dosage" and "claimant's medical treatment has been conservative.")

Moreover, the ALJ pointed out that claimant's daily activities include "household chores except for those that require heavy lifting and . . . socializ[ing]." (Tr. 25.) The record corroborates this finding. Plaintiff showers, bathes, and dresses by himself, goes grocery shopping, and engaged in rigorous exercise and heavy weight-lifting while incarcerated. The ALJ also properly cited inconsistencies between plaintiff's complaints at the hearing and those in the record as weighing

against plaintiff's credibility.[27]  (*Id.*)  *See Snyder v.
Barnhart*, 323 F. Supp. 2d 542, 547 (S.D.N.Y. 2004) (finding an
ALJ's analysis proper where it cited inconsistency between
plaintiff's testimony and the record as evidence of plaintiff
exaggerating symptomatic limitations).  In sum, there is
substantial evidence in the record supporting the ALJ's finding
that plaintiff's testimony regarding his pain and limitations
was not fully credible.

Finally, plaintiff argues that the ALJ erred by
failing to provide a sufficiently detailed credibility analysis
utilizing each criterion in SSR 96-7p and 20 C.F.R. § 404.1529.
(Pl. Mem. at 16.)  The ALJ need not explicitly address each of
the seven factors, however.  *See Snyder*, 323 F. Supp. 2d at 546
(rejecting a similar argument because the factors are "examples
of alternative evidence that may be useful [to the credibility
inquiry], and not as a rigid, seven-step prerequisite to the
ALJ's finding").  Rather, the ALJ's finding must, and did here,
contain precise reasoning, specify the weight given to the
plaintiff's testimony and the rationale for according such
weight, and have support in the record.  *Id.* at 547.  Given the

---

[27] The ALJ explained: "Specifically, he told Dr. Wahl (Exhibit 6F) that he is
able to engage in household chores except for those that require heavy
lifting and that he also socializes." (*Id.* at 25.)  Whereas at the
hearing, plaintiff testified that he "is unable to engage in any household
chores because he would need to navigate the stairs which would result in
dizziness.  However, the claimant subsequently testified that he is unable
to clean or care for his living space in the basement because of his
shortness of breath." (*Id.* at 18.)

record and the ALJ's superior perspective on this issue, the court has no ground to disturb the ALJ's finding on plaintiff's credibility.

### D. The Commissioner's Burden at Step Five of the Sequential Analysis

Plaintiff argues that the ALJ did not perform a "function by function" assessment of plaintiff's abilities required by Social Security Ruling 96-8p before deciding that plaintiff could do sedentary work and, thus, did not satisfy the Commissioner's burden at step five of the sequential analysis.[28] (Pl. Mem. at 14-17.)  This argument is without merit.

The ALJ made specific findings for each function, namely sitting, standing, walking, lifting, carrying, pushing, and pulling.  (Tr. 25.)  The ALJ made additional findings regarding plaintiff's mental and physical capacity to perform sedentary work.  (*Id.*)  Moreover, a vocational expert opinion confirmed that someone with plaintiff's specific attributes could perform sedentary jobs available in the national economy. (*Id*. at 194-98.)  Thus, the Commissioner's burden at step five was satisfied, and there is no ground for remand.

---

[28] The Commissioner's burden at step five of the sequential analysis is to show that plaintiff retains the RFC to perform certain available jobs. *Sobolewski*, 985 F. Supp. at 310.

### E. The ALJ's Decision not to Subpoena the Expert Witnesses for Cross-Examination

The plain language of 20 C.F.R. § 404.950(d)(1) gives the ALJ discretion to decide whether to subpoena a reporting physician. *Yancey v. Apfel*, 145 F.3d 106, 113 (2d Cir. 1998). Claimants do not have an absolute due process right to subpoena and cross-examine a reporting physician. *Id.* (holding that "practical concerns," such as financial and administrative burdens, "strongly militate against [such] a rule"). "[T]he requirements of due process are satisfied by providing a claimant with the opportunity to cross-examine a reporting physician 'where reasonably necessary to a full development of the evidence in the case.'" *Id.* (quoting *Flatford v. Chater*, 93 F.3d 1296, 1307 (6th Cir. 1996)). A decision not to subpoena is subject to "abuse of discretion" review. *See id.* (concluding that the ALJ fairly chose not to subpoena where a subpoena would not have added "anything of value" and no reasons existed to suspect the physician's reports were biased or inaccurate).

As plaintiff noted in his cross-motion (Pl. Mem. at 7), plaintiff did not have the opportunity to cross-examine the medical expert (Dr. Lombardi) or vocational expert (Mr. Pasternak) at his hearing because they both testified via post-hearing interrogatory. (*See* Tr. 12.) The ALJ relied on both experts in determining that plaintiff was not disabled. (*See*

*id.* at 25-26.) Although cross-examination might have revealed information helpful to evaluating plaintiff's claim, the ALJ had the discretion to determine that in-person testimony was unlikely to add new or valuable material information. There is no reason to suspect, and plaintiff does not allege, that either expert submitted biased or inaccurate opinions. Thus the ALJ did not abuse his discretion in this case, and this does not constitute a ground for remand.

## CONCLUSION

For the reasons set forth above, the court denies plaintiff's cross-motion for judgment on the pleadings and grants defendant's cross-motion for judgment on the pleadings. The Commissioner's decision is affirmed and the Clerk of the Court is respectfully requested to enter judgment in favor of the defendant and close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
       August 14, 2012


_____/s/_____
KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York